[No. D052192. Fourth Dist., Div. One. Apr. 8, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID O'SHELL, Defendant and Appellant.

[No. D052648. Fourth Dist., Div. One. Apr. 8, 2009.]

In re DAVID O'SHELL on Habeas Corpus.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III. through V.

1300

Counsel

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton and Sharon L. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**IRION, J.**—David O'Shell appeals an order involuntarily committing him for an indeterminate term to the custody of the State Department of Mental Health (DMH) after a jury found him to be a sexually violent predator (SVP) within the meaning of the Sexually Violent Predators Act (SVPA or Act). (Welf. & Inst. Code, § 6600 et seq.)[1]

O'Shell argues that the order must be reversed because (i) the trial court prejudicially erred in precluding him from testifying to the jury that he faced a life sentence under California's "Three Strikes" law if he reoffended; (ii) the SVPA violates the state and federal constitutional guarantees of due process because, after an initial commitment, the Act places the burden on the committed person, rather than the state, to demonstrate that he or she no longer requires confinement; (iii) the SVPA violates the state and federal constitutional right to equal protection because it treats SVP's differently from other civilly committed persons without adequate justification; and (iv) his commitment is illegal because it was initiated by a process that relied on an improper "underground regulation." As discussed below, we conclude that O'Shell's contentions are without merit and affirm the judgment.

### FACTS

In 1982, at the age of 19, O'Shell met a 16-year-old boy at a party and drove him to an isolated area. O'Shell threatened the boy with a knife, forced him to orally copulate him and then sodomized him. O'Shell robbed the boy as well. O'Shell was apprehended and pleaded guilty to forcible oral copulation; he was sentenced to 11 years in prison. In 1990, 15 months after his release from prison, O'Shell began a relationship with a woman who had a 13-year-old son. For approximately four years after entering the relationship, O'Shell molested the son from one to two times a week; the molestation included oral copulation, masturbation and sodomy. In the course of this conduct, O'Shell threatened the victim's life and told him that if he did not comply, O'Shell would begin molesting the victim's brother. O'Shell was

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

eventually caught and pleaded guilty to committing a lewd act upon a child; he was sentenced to 21 years in prison.[2]

Two psychologists, Jeremy Coles and Thomas MacSpeiden, examined O'Shell for purposes of the SVP trial. After their examinations, Drs. Coles and MacSpeiden diagnosed O'Shell with a mental disorder, "paraphilia not otherwise specified" (paraphilia NOS).[3] Dr. Coles testified that the disorder was characterized by " 'recurrent, intense sexually arousing fantasies, sexual urges or behaviors generally involving [1.] non-human objects, [2.] the suffering or humiliation of oneself or one's partner, or [3.] children or other nonconsenting persons that occur over a period of at least 6 months.' " Both doctors opined that as a result of this mental condition, O'Shell was likely, upon release from custody, to reoffend in a sexually predatory manner.

Two psychologists, Robert Halon and Christopher Heard, examined O'Shell for the defense[4] and determined that he did not suffer from a mental disorder. Drs. Halon and Heard testified that O'Shell was instead, like many criminals, simply prone to antisocial behavior. The doctors also criticized Drs. Coles's and MacSpeiden's reliance on paraphilia NOS, arguing that it was an incomplete diagnosis that simply deduced the existence of a nonspecific mental disorder from O'Shell's prior crimes.[5] O'Shell testified that he had changed in prison and would attempt to minimize the possibility of reoffending by avoiding contact with potential victims.

[2] Based on the above described offenses, the parties stipulated that O'Shell "has been previously convicted of committing sexually violent offenses against one or more victims pursuant to Welfare and Institutions Code section 6600 et seq." The complaint and guilty plea forms for each case were admitted into evidence and O'Shell acknowledged the offenses in his own testimony to the jury. From the testimony, it appears that O'Shell served six years of his 11-year sentence, and 11 years of his 21-year sentence.

[3] Dr. MacSpeiden also diagnosed O'Shell with antisocial personality disorder, and opined that the two disorders constituted "a crippling combination."

[4] While an SVP proceeding is civil in nature (see *People v. Allen* (2008) 44 Cal.4th 843, 860 [80 Cal.Rptr.3d 183, 187 P.3d 1018] (*Allen*)), we follow the common practice of characterizing the parties to the action as the "prosecution" and "defense." (See, e.g., *id.* at p. 866; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1192 [124 Cal.Rptr.2d 186, 52 P.3d 116] (*Hurtado*) ["Although the SVPA is a civil proceeding, its procedures have many of the trappings of a criminal proceeding."].)

[5] Paraphilia NOS is a common diagnosis in SVP proceedings. (See *People v. Felix* (2008) 169 Cal.App.4th 607, 616 [87 Cal.Rptr.3d 482].) It has also been the subject of controversy. (*Id.* at pp. 614–618.) O'Shell does not raise any challenge to the order based on the paraphilia NOS diagnosis. (See *People v. Williams* (2003) 31 Cal.4th 757, 778 [3 Cal.Rptr.3d 684, 74 P.3d 779] [rejecting challenge to SVP commitment, in part, because "[b]oth expert witnesses testified that defendant suffers from paraphilia, a serious, incurable mental disorder, which is characterized by the obsessive, repetitive, and driven nature of his criminal sexual violence"]; cf. *Kansas v. Crane* (2002) 534 U.S. 407, 413 [151 L.Ed.2d 856, 122 S.Ct. 867] [recognizing that the federal Constitution allows "the States . . . considerable leeway in defining the mental abnormalities and personality disorders that make an individual eligible for commitment"].)

## DISCUSSION

We discuss O'Shell's various appellate challenges below after providing a general overview of the SVPA.

### I.

### *Overview of the SVPA*

The SVPA provides for the involuntary civil commitment of certain criminal offenders following the completion of their prison terms. To be eligible for commitment under the Act, an offender must be classified as an SVP, which is defined as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (*Id.*, subd. (c).)

SVPA proceedings are initiated by the Secretary of the Department of Corrections and Rehabilitation (the Secretary). When the Secretary determines that an inmate appears to meet the SVP criteria, the inmate is referred to the DMH for assessment. (§ 6601, subd. (b).) The DMH "shall evaluate the person in accordance with a standardized assessment protocol, developed and updated by the State Department of Mental Health." (*Id.*, subd. (c).) The protocol must involve an evaluation by two doctors "to determine whether the person is a sexually violent predator." (*Ibid.*; see *id.*, subds. (a)–(d).)

If both doctors concur that "the person has a diagnosed mental disorder so that he or she is likely to engage in acts of sexual violence without appropriate treatment and custody," the DMH must request the filing of a commitment petition in the superior court in the county where the offender was convicted of the crime for which he or she is currently imprisoned. (§ 6601, subds. (d), (i).)

Once the petition is filed, the superior court holds a hearing to determine whether there is "probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).) If no probable cause is found, the petition is dismissed. However, if the court finds probable cause within the meaning of this section, the court orders a trial to determine

whether the person is an SVP. (*Ibid.*) The precise issue at trial is "whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release from the jurisdiction of the Department of Corrections or other secure facility." (§ 6602, subd. (a); see § 6600, subd. (a)(1).) The statute also includes an "implied requirement" that the forecasted sexual violence be *predatory*, i.e., that it be " 'directed "toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." ' " (*Hurtado, supra*, 28 Cal.4th at pp. 1186, 1182; see § 6600, subd. (e).)

The alleged SVP is entitled "to a trial by jury, to the assistance of counsel, to the right to retain experts or professional persons to perform an examination on his or her behalf, and to have access to all relevant medical and psychological records and reports." (§ 6603, subd. (a).) The jury's verdict must be unanimous. (*Id.*, subd. (f).)

At the conclusion of the trial, the trier of fact "shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator." (§ 6604.) "If the court or jury is not satisfied beyond a reasonable doubt that the person is a sexually violent predator, the court shall direct that the person be released at the conclusion of the term for which he or she was initially sentenced, or that the person be unconditionally released at the end of parole, whichever is applicable. If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility designated by the Director of Mental Health." (*Ibid.*; see generally *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 922 [119 Cal.Rptr.2d 1, 44 P.3d 949] (*Ghilotti*).)

■ A person found to be an SVP is entitled to an annual review to determine whether he or she "currently meets the definition of a sexually violent predator and whether conditional release to a less restrictive alternative or an unconditional release is in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6605, subd. (a).) The SVP may also retain, or request court appointment of, a qualified expert to examine him or her. (*Ibid.*) If the DMH determines that the committed person is no longer an SVP or, alternatively, can safely be released to a less restrictive treatment setting, it shall file a petition with the superior court to that effect. (*Id.*, subd. (b).) A probable cause hearing and subsequent trial follow at which the state must prove "beyond a reasonable doubt that the committed person's diagnosed mental disorder remains such that he or she is a danger to the health and safety of others and is likely to

engage in sexually violent criminal behavior if discharged." (*Id.*, subd. (d).) If the fact finder determines that the state has not met its burden, the committed person must be released. (*Id.*, subd. (e).)[6]

The statute also provides for the SVP to petition for release without the concurrence of the Director of Mental Health. (§ 6608.) For these purposes, the SVP is entitled to the assistance of counsel and may file a petition with the superior court after one year of the initial commitment and at yearly intervals thereafter. (*Id.*, subds. (a), (c), (h).) Unless the court deems the petition to be frivolous, or substantially identical to a previously denied petition (see *id.*, subd. (a)), a trial is held with the court acting as finder of fact. (*Id.*, subd. (d).) At the trial, the committed person must demonstrate that he or she is no longer an SVP by a preponderance of the evidence. (*Id.*, subd. (i).) If the trial court rules in favor of the committed person, "the court shall order the committed person placed with an appropriate forensic conditional release program operated by the state for one year." (*Id.*, subd. (d).) At the end of the year, the court holds a hearing to determine whether the (former) SVP should be unconditionally released. (*Ibid.*)[7]

## II.

### *O'Shell's Testimony That He Faced a Life Sentence If He Reoffended Was Relevant but Its Exclusion Was Harmless*

O'Shell contends that the trial court erred by excluding his testimony that he already had two strikes under the Three Strikes law and would not risk the automatic life sentence that would follow from a third strike. We address this contention after setting forth the pertinent procedural history.

### A. *Procedural History*

Prior to trial, the prosecution moved to preclude any mention that O'Shell was a two-strike offender who would face a life sentence if convicted of a third felony. The defense opposed the motion, arguing that the potential consequences of reoffending, and O'Shell's knowledge of those consequences, were relevant to a determination of his likelihood of reoffending.

---

[6] A parallel provision permits the DMH to seek judicial review through habeas corpus proceedings of a commitment if it determines that the committed person is no longer an SVP. If in such proceedings, "the superior court determines that the person is no longer a sexually violent predator, he or she shall be unconditionally released and unconditionally discharged." (§ 6605, subd. (f); see generally *Allen, supra,* 44 Cal.4th at p. 873.)

[7] Section 7250 also states that "[a]ny person who has been committed is entitled to a writ of habeas corpus . . ." and subsequent judicial review of his or her confinement.

The trial court granted the prosecution's motion, stating that the evidence "goes to part of the punishment aspect" and "is not particularly relevant." The prosecutor then sought to "clarify" the court's ruling. The prosecutor noted that her "motion was not only that it was not relevant . . . but also that it would be prejudicial under Evidence Code [section] 352." The trial court stated, "So noted."

■ At trial, the prosecution called O'Shell as a witness. (See *Allen, supra,* 44 Cal.4th at p. 860 ["the Fifth Amendment's guarantee against compulsory self-incrimination does not apply in proceedings under the SVPA"].) The prosecutor asked O'Shell about the parole supervision he would receive upon release. The prosecutor pointed out that O'Shell had committed one of his prior offenses while on parole, and that parole supervision and the threat of revocation, "didn't stop you" from committing a second offense. The prosecution then attempted to elicit that O'Shell violated his probation as a juvenile offender, but O'Shell stated he did not recall any such violations. Finally, the prosecution elicited that an 11-year prison sentence "didn't deter [O'Shell] from molesting" the second victim. The prosecutor asked, "If you're [found] not to be an SVP and you're placed on parole, the fact that you could be violated, that won't affect you either, will it, sir?" O'Shell explained that he had changed while in prison.

In response to this line of questioning, defense counsel asked O'Shell about the consequences of a violation of his release conditions. O'Shell stated, "It's a violation. I can go back to prison." O'Shell added, "If a violation constitutes a felony, then I go to prison for a very long time." The prosecutor objected, and the trial court sustained the objection and instructed the jury to disregard O'Shell's answer.[8]

B. *The Excluded Evidence Was Relevant*

O'Shell contends that the trial court erred in excluding as irrelevant his proposed testimony (and striking his testimony) that he was particularly motivated to seek treatment and avoid reoffending because he faced a life term if he reoffended under the Three Strikes law. We agree.

■ Unless otherwise provided by statute, "all relevant evidence is admissible." (Evid. Code, § 351.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the

---

[8] The issue arose again in the testimony of one of the prosecution's experts who opined that placing O'Shell in the community would be "a disservice to Mr. O'Shell" because "if he gets another conviction, he would go away for a long, long time." The prosecutor then stated, "We can't talk about that part," and the judge instructed the jury to disregard the answer.

determination of the action." (Evid. Code, § 210.) "[T]he trial court 'has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence.' . . ." (*People v. Weaver* (2001) 26 Cal.4th 876, 933 [111 Cal.Rptr.2d 2, 29 P.3d 103]; see Evid. Code, § 350 ["No evidence is admissible except relevant evidence."].) The SVPA itself contains a provision that emphasizes that "[n]othing in this section shall prevent the defense from presenting otherwise relevant and admissible evidence." (§ 6603, subd. (d).)

Relevance is a two-part inquiry. First, the fact sought to be proven must be "of consequence to the determination of the action." (Evid. Code, § 210.) Second, the proffered evidence must have some "tendency in reason" to prove that fact. (*Ibid.*) Here both parts of the inquiry were satisfied.

The fact sought to be proven was that O'Shell was not likely to reoffend. This is a central issue in an SVP trial. As our Supreme Court has emphasized, an SVP finding "requires both a qualifying mental disorder *and* a 'likel[ihood]' of reoffense, and the one does not predetermine the other." (*Ghilotti, supra,* 27 Cal.4th at p. 921, fn. 12.) Consistent with this case law, the jury was instructed that to find O'Shell was an SVP it had to determine that (i) he had a diagnosed mental disorder; (ii) as a result of that disorder he was "likely" to engage in sexually violent predatory criminal behavior; and (iii) it was "necessary to keep him in custody in a secure facility to ensure the health and safety of others." (See CALCRIM No. 3454.)[9] The instruction states that a person was "likely to engage in sexually violent predatory criminal behavior if there is a substantial, serious, and well-founded risk that the person will engage in such conduct if released into the community." (See CALCRIM No. 3454; *Ghilotti, supra,* 27 Cal.4th at p. 916.)

Thus, a jury in an SVP trial can properly conclude that an inmate has a mental disorder, but is not an SVP because he or she would be able to resist the urge to reoffend. (*Ghilotti, supra,* 27 Cal.4th at pp. 920–921 ["The requisite likelihood of reoffense is thus a separate determination which does not inevitably flow from one's history of violent sex offenses and a predisposing mental disorder."]; *Cooley v. Superior Court* (2002) 29 Cal.4th 228, 254 [127 Cal.Rptr.2d 177, 57 P.3d 654] ["We made clear in *Ghilotti* that the determination of likelihood of future dangerousness was an element that must be proved in addition to the existence of mental disorder in order to commit an individual as an SVP."]; cf. *Kansas v. Crane, supra,* 534 U.S. at p. 412 ["most severely ill people—even those commonly termed 'psychopaths'—

---

[9] The jury also had to find that O'Shell had committed a qualifying offense. (See CALCRIM No. 3454.) That element was undisputed. (See fn. 2, *ante.*)

retain some ability to control their behavior"].) Consequently, whether O'Shell was likely to reoffend was a fact of consequence to the determination of the action.

It is also clear that the proffered evidence met the second aspect of the relevance inquiry—it had some tendency in reason to disprove the likelihood of reoffense. As our Supreme Court has explained, "[m]any factors . . . may influence the disordered offender's *motivation*, ability, means, and opportunity to function lawfully without supervision or restraint despite [a mental] impairment." (*Ghilotti, supra,* 27 Cal.4th at p. 921, fn. 12, italics added.) One such factor is the offender's "expressed intent, if any, to seek out and submit to any necessary treatment" and *"any other indicia bearing on the credibility and sincerity of such an expression of intent." (Id.* at p. 929, italics added; see also *People v. Roberge* (2003) 29 Cal.4th 979, 987 [129 Cal.Rptr.2d 861, 62 P.3d 97] [clarifying that the definition of "the phrase 'likely [to] engage in sexually violent behavior' in section 6600, subdivision (a), should be given the same meaning as the phrase 'likely to engage in acts of sexual violence without appropriate treatment and custody' in section 6601, subdivision (d), the provision at issue in *Ghilotti*."].)

In the instant case, the severe penalties that would be imposed under the Three Strikes law if O'Shell were to reoffend, and his fear of those penalties, had a tendency in reason to increase O'Shell's "motivation . . . to function lawfully without supervision or restraint despite the [mental] impairment." (*Ghilotti, supra,* 27 Cal.4th at p. 921, fn. 12.) In addition, O'Shell claimed that he was willing to attend outpatient treatment for his disorder. His awareness of the severe penal consequence of reoffense bore on "the credibility and sincerity" of his expressed intent not to reoffend and to seek treatment to avoid doing so. (*Id.* at p. 929; see Evid. Code, § 210 [emphasizing that relevant evidence includes evidence that is relevant to the credibility of a witness]; cf. Evid. Code, § 780 ["Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing . . . ."].)

In sum, O'Shell's testimony as to the consequences of reoffense under the Three Strikes law was not properly excluded as irrelevant. The jury would, of course, be free to disregard the testimony (once admitted) as self-serving and entitled to little weight. Nevertheless, the excluded testimony was not irrelevant and the trial court did not have the discretion to exclude it on that basis.

## C. *The Trial Court's Ruling Cannot Be Affirmed Under Evidence Code Section 352*

Rather than contend that the trial court's ruling was correct on relevance grounds,[10] the Attorney General argues that the trial court "would not have abused its discretion by excluding the evidence under Evidence Code section 352" had it so ruled. The Attorney General contends that, as we are required to affirm a correct ruling on any ground, we should affirm the trial court's relevance ruling on the ground that the evidence would have been properly excluded under Evidence Code section 352.

■ We disagree with the Attorney General's contention for two reasons. First, a ruling under Evidence Code section 352 is expressly committed to the *trial court's* discretion by statute. Evidence Code section 352 states that the trial court "*in its discretion* may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*, italics added.) There is no provision in this statute or in the case law for an appellate court to conduct the requisite Evidence Code section 352 balancing in the first instance, which is what the Attorney General would have us do here.

The analysis might be different if the Attorney General were able to show that the evidence would have been excluded *as a matter of law* under Evidence Code section 352, but no such showing has been made.

While we agree (as we explain in pt. II.D., *post*) that the probative value of the excluded testimony was not particularly compelling, we nevertheless do not see a "substantial danger of undue prejudice," jury confusion or consumption of time inherent in O'Shell's testimony that he was particularly motivated not to reoffend by his fear of a third strike. (Evid. Code, § 352.) The testimony was brief and straightforward and spoke directly to a central issue in an SVP case—the likelihood of reoffending. Further, the evidence regarding the potential deterrent effect of likely criminal sanctions responded to a line of inquiry pursued *by the prosecutor* on direct examination. Thus, the proper treatment of the excluded evidence under Evidence Code section 352 was, at most, a question upon which reasonable judges could disagree and cannot be resolved as a matter of law on appeal.

Second, for evidence to be properly excluded under Evidence Code section 352, "the record must 'affirmatively show that the trial court weighed

---

[10] The Attorney General does not make any explicit argument that the evidence was irrelevant, contending only that it did not constitute "evidence of significant probative value" and "the probative value, if any," of the evidence "was not significant."

prejudice against probative value.' " (*People v. Prince* (2007) 40 Cal.4th 1179, 1237 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) This requirement provides "the appellate courts with the record necessary for meaningful review" and "ensure[s] that the ruling" is " 'the product of a mature and careful reflection on the part of the judge.' " (*People v. Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) Here, there is no such affirmative showing. In fact, the record reflects that despite the prosecutor's request, the trial court declined to engage in Evidence Code section 352 balancing.

## D. *The Error Was Harmless*

Although we conclude that the trial court erred in excluding O'Shell's testimony as irrelevant, we also believe reversal is not warranted because there has been an insufficient showing of prejudice.

An appellate court may not order a new trial on the ground of the erroneous exclusion of evidence unless the record shows that, absent the error, there is a reasonable probability that the outcome would have been different. (See Cal. Const., art. VI, § 13 ["No judgment shall be set aside, or new trial granted, in any cause, on the ground of . . . the improper admission or rejection of evidence . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."]; Evid. Code, § 354 ["A verdict or finding shall not be set aside . . . by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error . . . is of the opinion that the error . . . complained of resulted in a miscarriage of justice . . ."].)[11]

In the instant case, evidence concerning O'Shell's enhanced motivation to avoid a felony conviction, while relevant, was tangential to the primary disputed issue at trial. The focus of the defense case was not that O'Shell was unlikely to reoffend. Rather, the defense tried to show that even if O'Shell were likely to reoffend, it would not be because of any mental disorder. This contention, if accepted by the jury, constituted a complete defense because "[a] sex offender who *lacks a qualifying mental disorder* cannot be committed *no matter how high his or her risk of reoffense.*" (*Ghilotti, supra,* 27 Cal.4th at p. 921, fn. 12.)

---

[11] O'Shell recognizes the *People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] (*Watson*) "reasonable probability" standard as the appropriate standard of review. (See *People v. Buffington* (2007) 152 Cal.App.4th 446, 456 [62 Cal.Rptr.3d 223] [analyzing trial court's evidentiary error in SVP proceeding under *Watson* standard of review]; *People v. Alcala* (1992) 4 Cal.4th 742, 791 [15 Cal.Rptr.2d 432, 842 P.2d 1192] [evidentiary rulings reviewed for prejudice under *Watson* reasonable probability standard]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [31 Cal.Rptr.2d 321, 875 P.2d 36] [evidentiary error under state evidence rules is properly evaluated under "standard of review . . . announced in [*Watson*], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension"].)

Defense counsel framed the case around the mental illness question, contending in closing argument that "[t]he issue is whether [O'Shell] has a current diagnosable mental disorder." As noted above, the prosecution's experts diagnosed O'Shell with paraphilia NOS. The defense experts disputed the diagnosis and contended that paraphilia NOS was not a distinct mental disorder, but merely an empty diagnosis that reasoned backward from O'Shell's prior criminal acts. The jury, by its verdict, credited the prosecution's experts on this key disputed question.

On the separate question of the likelihood of reoffending, there was little serious dispute. Even Dr. Halon, a defense expert, testified that "any prudent person would have to consider [O'Shell] to represent a danger of reoffending." O'Shell's own testimony and statements to the evaluating psychologists were also damning on this point. O'Shell explained that his sex crimes fulfilled a need and that he had been "addicted to the behavior" in the four years he was molesting his second victim. Further, O'Shell's prior offenses themselves painted a graphic picture of an uncontrolled predator who ceased offending solely upon incarceration.

When the prosecutor asked O'Shell "What are you going to do to avoid victimizing another person?" O'Shell responded, "That's a very good question . . . . I can't specifically say." O'Shell then asserted that he would try to "avoid certain situations," adding, somewhat unrealistically, that if he encountered children, he "would run away as fast as I could."

In addition, O'Shell's testimony, even if buttressed by his fear of a potential Three Strikes sentence, remained subject to obvious impeachment on the grounds that (i) he had a strong interest in the outcome of the proceedings; and (ii) he had not previously been deterred by the prospect of significant criminal penalties. Even Dr. Halon, who testified on O'Shell's behalf, stated he did not credit O'Shell's claim that he had changed in prison, stating that O'Shell had no genuine remorse and was a "master manipulator." (Cf. *Allen, supra,* 44 Cal.4th at p. 873 [concluding that error in precluding entirety of defendant's testimony in SVP proceeding was harmless].)

In sum, the evidence was overwhelming and largely uncontested that O'Shell posed a "*substantial*[,] . . . *serious, and well-founded risk*" of reoffending upon release. (*Ghilotti, supra,* 27 Cal.4th at p. 916.) Consequently, the fact that the trial court erroneously excluded a portion of his testimony relevant only to this point was harmless. As the case was litigated primarily on the question of whether O'Shell had a qualifying mental disorder, it is not reasonably probable that had the court allowed O'Shell's testimony regarding his fear of the Three Strikes law, the jury would have reached a different verdict.

III.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

Judgment is affirmed. Petition is denied.

Huffman, Acting P. J., and McDonald, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 8, 2009, S173045.

---

*See footnote, *ante*, page 1296.