Filed 5/27/14  P. v. Purdue CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER LEO PURDUE,<br><br>Defendant and Appellant. | C071813<br><br>(Super. Ct. No. CRF11324) |

Defendant Christopher Leo Purdue was convicted by jury of several sex offenses committed against his daughter, E., during three separate incidents when she was 14 and 15 years old.[1]  He was sentenced to serve an aggregate term of 32 years 4 months in state prison.

---

[1]    Specifically, defendant was convicted of three counts of forcible rape (Counts 1-3), one count of forcible sexual penetration (Count 4), one count of forcible sexual penetration of a minor who was 14 years of age or older (Count 5), one count of assault with intent to commit rape or unlawful sexual penetration (Count 6), two counts of committing a lewd or lascivious act on a child of 14 or 15 years (Counts 7-8), one count of incest (Count 9), and two counts of sexual penetration of a minor who was under 16

1

On appeal, defendant claims the trial court abused its discretion and violated his right of confrontation under the federal Constitution by excluding evidence that E. admitted to falsely accusing a former teacher of molestation because "she was just mad" and "wanted the attention." We conclude the exclusion of this evidence under Evidence Code[2] section 352 was a prejudicial abuse of discretion. Defendant's constitutional claim is forfeited for failure to raise it below. And while we have discretion to reach this claim despite the forfeiture, our conclusion the judgment must be reversed for state law evidentiary error renders discussion of the constitutional claim unnecessary.

FACTS

The trial in this case was largely a credibility contest between E. and defendant. As the prosecutor stated in closing: "Somebody is not telling the truth. And it boils down to is [E.] telling the truth? Or is [defendant] telling the truth?" The trial court excluded evidence bearing directly on E.'s credibility. To facilitate our discussion of whether this was a prejudicial abuse of discretion, we present the competing testimony of E. and defendant in detail.

But we begin with some undisputed background. Defendant and S.G. married in 1995, separated in 2008, and finalized their divorce in 2010. Their three children, daughters E. and A., and son, C., moved in with defendant in February 2009. They lived in a three-bedroom house. Defendant slept in the master bedroom, E. shared a bedroom with A., and C. had his own bedroom. Despite this arrangement, E. routinely slept in

_____

years of age by a person over 21 years of age (Counts 10-11). With respect to Counts 2 and 3, the jury found the victim was a minor who was 14 years of age or older. With respect to Counts 7 and 8, the jury found defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury. Defendant was also convicted of two counts of furnishing marijuana to a minor who was 14 years of age or older (Counts 12 and 13).

[2] Undesignated statutory references are to the Evidence Code.

2

defendant's bed.  She testified it was "normal" for her to do so, particularly on nights she and her sister were arguing.  Defendant testified he "didn't think anything of [it]" and referred to E. as "a daddy's girl."  Defendant's girlfriend, A.L., stayed at the house most weekends and occasionally during the week.  Her daughter and son also spent the night there.  E. slept in her own bed when defendant's girlfriend stayed the night.

In January 2011, defendant and his children moved into a two-bedroom house on the same street.  E. continued to share a bedroom with her sister, while C. shared a bedroom with defendant.  Because C. routinely slept on the couch, E. continued to sleep in defendant's bed when his girlfriend was not there.

In June 2011, after a physical fight with defendant, the details of which will be set forth below, E. accused defendant of committing the crimes at issue in this case.  In an interview with Deputy Brian Rasmussen of the Yuba County Sheriff's Department, she disclosed two incidents, one in January or February 2011, and another in May 2011.  Two days later, during an interview with Detective Frank Knight, she again described two incidents.  This time, the first incident was said to have occurred in April 2010.  About two weeks later, E. met with a female investigator, Investigator Barr, and revealed more details about the incidents.  Several months later, about a week before trial, E. disclosed an additional incident said to have occurred two weeks after the April 2010 incident.

### E.'s Testimony

According to E.'s testimony at trial, defendant raped her for the first time in April 2010 at the three-bedroom house.  She was 14 years old.  E. described:  "I went to sleep in [defendant's] room that night.  He came home from the bar, and he came in there and started kissing on me and saying [A.L.]'s name, which is his girlfriend.  And I told him, 'Dad, this is me.  It's [E.],' and everything, and he just kept going like he thought it was [A.L.], and took down my pants."  E. testified she cried and told him to stop.  She also kicked and tried to push him off of her.  Defendant held her arms over her head and

3

penetrated her vagina with his fingers and then his penis. E.'s friend L., who was staying at the house at the time, was sleeping in E.'s bed when the rape occurred. When defendant was done, E. got up and went to her bed. She did not tell L. what happened because she was "scared and embarrassed." The following morning, rather than confront defendant, E. "tried acting like everything was normal."

About two weeks later, defendant gave E. and L. an alcoholic beverage called Four Loko, which they drank in his bedroom. When E. fell asleep on defendant's bed, L. went out to the living room and fell asleep on the couch. Later that night, E. woke up to find defendant on top of her. She testified, "the same thing that happened the first time" happened again. After this incident, E. continued to sleep in defendant's bed because she "thought maybe it was just the alcohol" and "didn't want to believe it" happened.

In January 2011, after the family moved to the two-bedroom house, defendant again raped E. while she slept in his bed. She again resisted and was overpowered.

In February 2011, E. missed her period and took a home pregnancy test. The results were positive. E. had a boyfriend at the time, J.C., with whom she was sexually active. Sometime after she told J.C. about the results of the pregnancy test, his stepfather called defendant and told him. Defendant told E. the pregnancy "was going to ruin [her] life" and she "needed to get an abortion." E. told defendant she did not want an abortion. Defendant responded: "Well, the baby might come out retarded." E. took this to mean defendant believed he might be the father. She then told defendant she "didn't believe in abortions." Defendant became angry, punched her in the stomach, and then kicked her in the stomach when she fell to the ground. A few days later, E. began spotting and defendant drove her to the hospital. According to E., the doctor told her they were not

4

able to detect a fetus and she might have had a miscarriage. He also told her to come back later, but defendant never took her back to the hospital.[3]

E. also testified to four or five incidents at the two-bedroom house in which defendant penetrated her vagina with his fingers, but did not have sex with her. She further testified defendant began smoking marijuana with her in March 2011.

In May 2011, defendant raped E., now 15 years old, for the fourth and final time. Again, she was sleeping in his bed. E. testified she awoke to find defendant "putting his penis inside of [her]," but then said he penetrated her vagina with his fingers before inserting his penis. When she tried calling out for her brother and sister, defendant "put his hand over [her] mouth and told [her] to shut up and slapped [her]." Defendant then held her arms over her head and continued. At some point, defendant grabbed a purple dildo and held it while he raped her, but E. did not know whether he penetrated her with it. Eventually, defendant pulled out and ejaculated on her stomach. He then used a t-shirt to wipe off the ejaculate. Defendant did not smell like alcohol during this rape.

The same month, E. moved in with her mother. According to E.'s testimony, the move was prompted, not by the sexual abuse, but by a fight between her and defendant one morning before school. As she explained: "[H]e seen me walking towards Wal-Mart whenever he went to AM/PM to get his coffee, and we got into an argument and everything. And then we fought. We got into a fight, and he hit me and stuff, and then he dropped me off at school." After school, E. called her mother and asked to be picked up. She then moved in with her mother and stepfather in another town, but continued to

---

[3]     The day E. was taken to the hospital, she posted a series of updates on Facebook, one of which read: "Five weeks pregnant. Seen a pic of the baby, had an ultrasound done." E. acknowledged during cross-examination that "in the ultrasound they couldn't tell how far along [the pregnancy] was because they didn't see the baby." There were various other inconsistencies between E.'s testimony and social media updates.

spend the night at defendant's house on a regular basis because she "liked visiting" and had "more freedom" there.

In June 2011, defendant and E. got into another physical altercation. The fight was prompted by an argument between E. and her sister over use of a cell phone charger. E. explained she was using A.'s charger; A. unplugged E.'s cell phone; a yelling match ensued. Defendant intervened and told E. to hand over the cell phone. At some point during the argument, she got on the phone with J.C. Defendant yelled for her to get off the phone. When she refused, he yelled for J.C. to "hang up." J.C. said: "All right. Bye," and, "Don't let him do anything to you, please." E. then went into the bathroom to call J.C. back. Defendant followed and tried to take the cell phone, which E. put down her pants so defendant could not take it. When E. told defendant she "would rather be dead," defendant threw her in the bathtub, causing her to hit her back on the faucet. Defendant then grabbed her by the throat as she stood up and choked her against the bathtub wall. Defendant said he would have to call the police because she threatened to commit suicide. E. responded: "Good. Call the cops, because I have way more to tell them about this, about stuff." Defendant said E. was "done with" if she "got the kids [taken] away," which she understood to be a warning not to say anything about him raping her. At some point, E.'s brother C. came into the bathroom and said: "Dad, stop. Dad, stop." Defendant calmed down. Rather than call the police, he called E.'s mother and told her to pick up her daughter. When E. said she was not going to her mother's house, defendant slapped her in the face.

Later in the evening, defendant took a knife from the kitchen and came into the living room where E. and her siblings were hanging out. Holding the knife blade to his neck, defendant tried to place the handle in E.'s hand, saying he was going to kill himself and she should do it. The children were "crying and telling him to stop." Eventually, defendant stopped, but not before the knife drew some blood. Still later, after the

6

children had gone to bed, defendant got E. out of bed and showed her a note saying he loved each of them. He told E. he would not be there in the morning.

Two days later, E. told J.C. defendant raped her. The disclosure was prompted by a text message from J.C. asking whether she "was cheating on him," to which she responded: "[T]here could be other ways that that could happen" and "don't necessarily mean I cheated on you." J.C. then sent a series of text messages asking what she meant, prompting E. to respond: "[M]y dad raped me." She then told him she did not want to talk about it. J.C. "got mad" and told her she needed to tell her mother before defendant did the same to her sister or another girl. After initially refusing, she called her mother. E.'s mother and stepfather picked her up and drove to a parking lot, where J.C. met them and revealed what E. had told him. E.'s mother "started crying" and told her she needed "to go to the cops and tell them what was going on."

As mentioned, Deputy Rasmussen was the first law enforcement officer to speak to E. about the sexual abuse. She did not reveal everything to him because she "didn't feel comfortable talking to somebody [she] didn't know." Two days later, she spoke to Detective Knight and still did not reveal everything because she "didn't feel comfortable talking."

At Detective Knight's suggestion, E. made a pretext phone call to defendant. During the phone call, which was played for the jury during E.'s testimony, she told defendant: "I don't want to see you dead." Defendant responded: "I know, hun. And you know what? I did a lot of thinking and, um, I understand, and I'm not going to try to force you to come home or anything else. But, um, really I know how that feels, 'cause my dad did it. And I never want you kids to feel that way, and I'm sorry that I did what I did, and I really don't blame you guys if any of you guys don't want to come back to me right now. And, um, just know that I love you, and I promise to God on everything in this world that I love that I will never, ever, ever go there again. Ever." A short time

7

later, E. said:  "I don't know . . . another reason why I'm scared is because what's happened with us" and "I just don't want you to get to [A.] and do that to her." Defendant responded:  "You know what, are you?  Is that why your Aunt . . . is calling people?"  E. answered:  "No, it's not.  Nope, I haven't even talked to anybody, Dad.  I wanted to talk to you before anything."  Defendant then said:  "And I promise you that I will, if you come home, I'll prove it.  I can prove it to you that, that will stop.  You know what, honestly, [E.], I felt like you kinda used that against me, like, you tried to do that, so that you could get your way.  And you know what you don't even have to do that and . . . all's you have to do is be good in school.  I promise.  Just be good in school and . . . frickin' . . . don't do, don't say you're going to go somewhere and lie to me.  I mean, call me and say, 'Hey, can I go frickin' here and there?'  But, if you come home, I promise you that you'll, that I'm, I'm a changed person right now, [E.]  I am.  After the other night, when all that happened . . . I really, I thought about it.  And even after you guys left I thought about it so hard and . . . .  You know what?  Um, I started looking . . . I actually went out and applied for jobs. . . .  I'm . . . I need to feel good about myself.  I need to go do stuff.  You know what I mean?  We need to be . . . we need to be a frickin' family again.  You know what I mean?"

Defendant then asked whether E. would be coming back to his house or staying with her mother.  After initially saying she would stay with her mother for awhile, E. said:  "I don't know.  You . . . I don't know, when you, it kind of hurt knowing . . . like it hurt me in my head and knowing that you had, well, sex with me."  Defendant responded:  "You know what?  I gotta go then, 'kay?  Um, I don't want to . . . really [E.], I don't . . . I don't want to be here no more.  I love you.  And, I didn't do . . . you know what?"  E. asked:  "What?"  Defendant continued:  "I love you.  Will you come stay with me for a frickin' couple days and . . . and uh . . . and see that . . . I am a different person?"  When E. said she would, defendant asked if she and J.C. would want to go camping for the

Fourth of July. E. answered: "Sure. Yeah," and added: "But everything will stop?" Defendant responded: "Put that on everything I love in this whole world and . . . honestly. And you know what? You . . . put my hands on you and getting mad? That's done! Done, too. You know what I mean? Um, and that goes for your brother and sister too, 'cuz . . . I you know what? I need to learn, go to school, class, do something and get anger management problems. You know what I mean?"

Two weeks later, E. spoke with Investigator Barr and revealed more details about the sexual abuse previously disclosed to Deputy Rasmussen and Detective Knight. About a week before trial, E. revealed an additional incident to Investigator Barr, the second incident involving the Four Loko. E. testified she "just remembered" and explained: "Well, I thought I told you guys but -- because I told my mom about it."

Prior to trial, E. wrote a letter to the prosecutor, which read: "I do no longer want to proceed with this case with my father. I would like to end all of this and let my dad free. When I came in, I didn't expect for it to be this way. You guys are turning things around that doesn't need to happen. I would greatly appreciate it if you drop this case and forget about it all. And if you try contacting me, I will not answer any questions. My answer that I will say is I respectfully refuse to answer that question." E. testified this letter was prompted by a conversation she had with her grandmother, defendant's mother, in which she was told defendant may spend the rest of his life in prison. E. also wrote a letter to defendant, in which she said: "I'm so sorry I did this."

### Defendant's Testimony

Defendant drank alcohol and smoked marijuana in front of his children and occasionally allowed E. to drink alcohol, which he admitted was "probably a big mistake." He denied allowing her to smoke marijuana.

With respect to the April 2010 incidents, defendant confirmed E.'s friend L. stayed at the house for about two weeks. He denied having sex with E. while L. was

staying at the house, or at any other time, and further denied holding her arms down to restrain her. According to defendant, while E. routinely slept in his bed, she did not do so while L. was there. Defendant denied coming home intoxicated at any time while L. was at the house. He explained: "I wasn't and probably still am not the most . . . trusting dad, and I would not leave them two together all night without . . . being supervised." Defendant did admit to providing E. and L. with two cans of Four Loko on L.'s birthday, with the permission of L.'s mother. Defendant testified E. and L. drank their beverages in the kitchen while he and his girlfriend were in his bedroom. E. and L. slept in E.'s bed that night. E. did not get into his bed that night, or any other night while L. was at the house.

Defendant also denied having sex with E. in January 2011, and further denied having "any type of sexual relations" with her at any time. He admitted he was told she was pregnant in February 2011, but denied punching and kicking her in the stomach. According to defendant, the day he was told about the pregnancy, he and his girlfriend were supposed to go to Jackson for the weekend to visit his sister. Defendant was "hurt" by the news and "didn't really know what to say" to E., so they went to Jackson as planned to give defendant time to "clear [his] head." Before they left, defendant told E. he knew about the pregnancy and "needed time to think." He also told her they would "work it out." When they returned the following Monday, defendant talked to E. about the pregnancy and told her she could either keep the baby or have an abortion, but putting the child up for adoption was not an option. E. said she did not want an abortion. Defendant denied telling E. "the baby might be retarded." He had no reason to believe he was the father. The next day, E. told defendant she was spotting. Defendant took her to the hospital, where the doctors "said it didn't look like she was pregnant but she could have been."

Defendant testified E. moved in with her mother around April 2011. The move was his idea. He explained: "[I]t was a battle to control her and to get her to listen and it was hard, and I [thought] that her mom needed to step in for a minute and help." E. did not want to live with her mother and continued to visit defendant. When asked whether he had sex with E. in May 2011, defendant responded: "As I said before, I never and would not, so, no."

Defendant did confirm a physical altercation occurred in June 2011. His account of the fight paralleled that of E., although it also varied significantly, particularly with respect to E.'s participation. As defendant explained, an argument between E. and A. over use of a cell phone charger led to defendant trying to take E.'s cell phone away. E. put the phone down her pants. Defendant became "really mad" and "yelled at her and told her to give [him] the phone." E. was also "yelling and screaming" at defendant, prompting him to slap her. E. then punched defendant in the shoulder with her fist. Defendant got "very mad" and "[t]hrew her on the couch." They continued yelling at each other while E. sat on the couch and defendant stood over her. Eventually, E. said she was leaving, got up, and tried to get to the front door. Defendant "grabbed her again" and "sat her on the couch." E. got up again and kicked defendant in the chest. At this point, A. yelled at her sister: "Stop. [E.], just stop." E. tried to punch A. Defendant grabbed E. by her shirt and threw her on the floor next to the couch. E. again got up and went into the bathroom. Defendant followed and found E. standing on the edge of the bathtub, trying to open the window. He grabbed the back of her shirt and pulled her into the bathtub. E. punched defendant several times, "swinging wild," and told him: "Get out of here." Defendant then grabbed E. by the shirt collar and held her against the wall. E. yelled out that defendant was choking her, but defendant did not believe her because "she was still yelling," so he "just held her there." E.'s brother then came into the

11

bathroom and said: "Please stop." Defendant "realized [he] was hurting them all," let go of E., and walked out of the bathroom.

Sometime later, E. came into the living room where defendant was and told him "she was going to kill herself." Defendant grabbed a butcher knife from the kitchen and held it against his neck. As he explained: "I wanted her to see how it felt when . . . somebody you love says they're going to kill themselves and always threaten it." E. said: "Please don't." Defendant then asked her to hand over the cell phone. E. refused. Defendant held the knife to his neck for several minutes while the children cried and asked him to stop. Eventually, E. ran outside the house and yelled: "He's trying to kill himself." At this, defendant put down the knife and told her to get back inside and take the phone to her room, which she did. Later that night, defendant wrote a suicide note, again hoping E. would understand how it felt to have a loved one threaten suicide. After writing the note, defendant "thought it was maybe not the right thing to do" and set the note aside without showing it to E. Apparently, one of the children found the note.

One or two days after the fight, E. called her mother and asked to be picked up. Defendant's next contact with her was the pretext phone call described above. He testified that when he apologized during the phone call, he was talking about the violent altercation and his suicide threat; he was not talking about any sexual conduct with his daughter. When he said, "I felt like you kind of used that against me," defendant was referring to E. using his "temper problem" against him, angering him "to the boiling point" and then threatening to call child protective services (CPS) when he would finally "explode in anger," like he did the night of the fight. When E. specifically accused defendant of having sex with her, he initially said he had to get off the phone because he "was about to blow up," and explained: "[S]he has already threatened to make accusations against her stepdad. She has threatened to call C.P.S. on me. I thought now she's going to pull this on me."

12

### *Other Testimony*

E.'s mother, S.G., testified for the prosecution. She "was floored" by the revelation of sexual abuse and asked: "Are you sure you're just not mad at your dad? These are serious allegations." E. then "started crying" and said she loved defendant too much to "lie about these kind of things." S.G. also testified E. sometimes lied, like a "typical teenager."

Dr. Anthony Urquiza also testified for the prosecution. He provided expert opinion concerning Child Sexual Abuse Accommodation Syndrome, the five parts of which are "secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and . . . retraction."

Detective Knight testified for the prosecution and Deputy Rasmussen testified for the defense. They described their respective conversations with E.

Defendant's girlfriend, A.L., also testified for the defense. Describing defendant's sexual style, she testified he was neither "aggressive" nor "passive," but somewhere "in the middle." Defendant never called her by her first name during sex. A.L. acknowledged keeping a purple dildo in defendant's dresser drawer next to his bed. While defendant smoked marijuana in front of his children, A.L. never saw him provide marijuana to his children or allow them to smoke it.

E.'s boyfriend, J.C., also testified for the defense. He testified he asked E. whether she was cheating on him one or two weeks prior to her telling him defendant raped her.

Finally, E.'s grandmother, D.P., testified for the defense. She testified E. called her and said she wanted to speak with the District Attorney. D.P. told E. her Aunt S. would take her to the District Attorney's office, or she could call or write a letter. E. decided to write a letter and asked what she should put in it. D.P. told her to "put what's

in her heart." She did not believe she discussed defendant's potential punishment with E., but added: "I know her Aunt [S.] talked to her about that."

DISCUSSION

I

*Section 352*

Defendant claims the trial court prejudicially abused its discretion by excluding evidence E. admitted to falsely accusing a former teacher of molestation. We agree.

A.

*Additional Background*

During trial, the defense sought to introduce testimony from a former friend of E., A.M. A hearing was held outside the presence of the jury under section 402, during which A.M. testified E. told her she had falsely accused a former teacher of molestation. A.M. explained: "[W]e were just talking about, you know, life situations, and she just looked at me and she was like, '[A.M.], I need to tell you something.' And I was like, 'Okay.' And that's when she admitted to me that it was all a lie and she wanted the attention because she was mad." A.M. admitted to knowing nothing about the case, except what E. had told her about it. Specifically, E. told A.M. that, contrary to her previous accusation, the teacher "really did not touch her and he really was not checking her out." A.M. also testified it was common for E. to lie and exaggerate, but provided no specific examples.

With respect to admissibility, defense counsel argued: "I think her statement is admissible. Her statement to [A.M.] is admissible wherein she's admitting an untruthful act. And the act is apparently accusing a teacher of sexually touching. I don't believe the act should be explored. It's the admission of untruthfulness that is relevant." The prosecutor disagreed, arguing: "I don't think that anything [A.M.] testified to should be admitted. She obviously has a solid dislike for [E.] She's testified about how there are

14

all these known lies, exaggerations, but she couldn't give any examples. She knows nothing about the [prior accusation] other than what she's heard, and the issue of the [prior accusation] is -- I think is totally irrelevant and would raise issues that would be precluded under [sections] 352, 782[4], and I just don't -- I don't see the relevance and admissibility of anything that she testified to this morning."

The trial court excluded the evidence under section 352, explaining: "I don't believe that it's a [section] 782 issue since it goes to credibility. However, in considering the [section] 352 considerations, I do believe that it would create a substantial danger of undue prejudice that far outweighs the probative value and also of misleading the jury, confusing the issues. If this were allowed to be brought in, then certainly there would be then almost the requirement that the District Attorney would have to obtain other evidence and we would have like a mini trial on that, so I'm not going to get into that but it's not based on [section] 782 considerations."

## B.

### *Analysis*

Evidence E. falsely accused a former teacher of molestation was highly relevant to the jury's assessment of her credibility. The trial court should not have excluded this evidence under section 352.

In a rape case, evidence the complaining witness has made a prior false accusation of sexual misconduct is "highly relevant" and admissible under section 1103 to impeach the credibility of that witness. (*People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 599-

---

**4** Section 782 sets forth a procedure for determining the admissibility of "evidence of sexual conduct of the complaining witness" that is "offered to attack the credibility of the complaining witness." (§ 782, subd. (a).) Evidence of a false accusation is not "evidence of sexual conduct" within the meaning of section 782. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456.)

15

600 (*Burrell-Hart*); § 1103, subd. (a)(1).) Obviously, the probative value of such evidence for purposes of impeachment depends upon proof the prior accusation was false (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1097 (*Bittaker*)), and the trial court retains discretion under section 352 to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

Rulings under section 352 "come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.) Our Supreme Court has explained: "Section 352 permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption. That section requires that the danger of these evils substantially outweigh the probative value of the evidence. This balance is particularly delicate and critical where what is at stake is a criminal defendant's liberty." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; *People v. Tran* (2011) 51 Cal.4th 1040, 1047 ["section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect"]; see also *People v. Holford* (2012) 203 Cal.App.4th 155, 168 [section 352 objection should be overruled "unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' " of one of the statutory counterweights].) Accordingly, "section 352 must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense. [Citations.] Of course, the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*Burrell-Hart*, *supra*, 192 Cal.App.3d at p. 599.)

In *Burrell-Hart*, *supra*, 192 Cal.App.3d 593, a forcible rape case, the defendant tried to introduce evidence the complaining witness (Mary) had falsely accused another

man (Fields) of attempted rape. Mary and the defendant had previously worked at a bar together, during which they argued over bar maintenance. The pending charges involved Mary and the defendant leaving the bar together and driving to his apartment, where he forcibly raped her. (*Id*. at pp. 595-596.) The prior accusation involved Fields, one of Mary's customers, slapping her in the face at the bar and, later that night, coming over to her house, where he " 'tried to break into her house . . . and tried to rape her.' " (*Id*. at pp. 596-597.) The Court of Appeal held the trial court abused its discretion in excluding this evidence under section 352. (*Id*. at p. 599.) The court first explained the evidence was relevant because it "could support a finding that Mary, having previously made a false accusation of physical and threatened sexual abuse against a man with whom she had fought would under similar circumstances herein have a motive to testify falsely against defendant with whom she admittedly had a prior disagreement or fight and with whom, according to one witness, she was not even on speaking terms." (*Id*. at pp. 597-598.) Turning to section 352, the court explained: "Although the proffered evidence here was conflicting with respect to whether Mary had even accused Fields of having tried to rape her, and there was at least some dissimilarity in the incidents since Mary never reported Fields's incident to the police, the evidence of prior allegedly false accusations is highly relevant. Moreover, since the evidence was to be presented by the testimony of three witnesses, two of whom testified anyway, the presentation of said evidence would not consume an undue amount of time. Nor would the jurors necessarily be confused or misled if they were given the opportunity to compare the circumstances of this case with the Fields incident to determine if the victim lied and would do so again in similar circumstances. Accordingly, since the trial court's discretion should 'favor the defendant in cases of doubt' [citation], the trial court properly should have admitted this evidence." (*Id*. at pp. 599-600.)

17

Here, the proffered testimony was that E. admitted to falsely accusing a former teacher of molestation because "she was just mad" and "wanted the attention." The accusation against defendant came after a fight during which defendant physically assaulted her. E.'s mother "was floored" by the accusation and asked: "Are you sure you're just not mad at your dad?" As in *Burrell-Hart, supra*, 192 Cal.App.3d 593, evidence of the prior false accusation was highly relevant because it tends to support a finding E., having previously made a false accusation of molestation against a teacher when she was mad, would also have a motive to fabricate the accusation against defendant, who physically assaulted her just two days before. Also like *Burrell-Hart*, presentation of this evidence would not have taken an undue amount of time. While E. would have to be given an opportunity to explain or deny the prior statement to A.M., she testified anyway. A.M. had no independent knowledge of the prior accusation and would simply have testified to E.'s prior inconsistent statement. The trial court expressed concern this would require the prosecutor to put forward "other evidence" relating to the prior accusation, presumably evidence the prior accusation was in fact true, but this is not necessarily the case. The prosecutor did not make an offer to the trial court such evidence existed. And, in any event, the trial court would retain discretion under section 352 to limit such evidence. What the trial court could not do, on these facts, is prevent the defense from introducing a prior inconsistent statement of the complaining witness on the most critical aspect of the case—motive to fabricate the charges—simply because other evidence might also need to be introduced.

Nor does the record reflect any reason to believe the jury would have been confused or misled by A.M.'s testimony, E.'s explanation or denial, or any other evidence shedding light on the prior accusation. This case, as the prosecutor acknowledged in closing, was a credibility contest between E. and defendant. There was no physical evidence supporting E.'s claims. And defendant's statements in the pretext

18

phone call were ambiguous. Far from confusing or misleading the jury, the proffered evidence would have allowed the jury to "compare the circumstances of this case with the [prior] incident to determine if [E.] lied and would do so again in similar circumstances." (*Burrell-Hart*, *supra*, 192 Cal.App.3d at p. 600; see also *People v. Franklin* (1994) 25 Cal.App.4th 328, 336 [evidence the complaining witness falsely accused her mother of sexual abuse should have been admitted to impeach her credibility with respect to similar claims made against the defendant; the trial was "basically a credibility contest" between the complaining witness and the defendant and the physical evidence "was ambiguous"].)

The trial court also cited a "substantial danger of undue prejudice" in excluding the evidence. However, " '[t]he "prejudice" referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against [one party] as an individual and which has very little effect on the issues.' [Citation.]" (*People v. Wright* (1985) 39 Cal.3d 576, 585.) Evidence bearing on E.'s credibility and motive to fabricate charges against defendant was highly probative and had "no 'unique tendency' to evoke any emotional bias against the prosecution." (*People v. Minifie*, *supra*, 13 Cal.4th at p. 1071.)

Nor are we persuaded by the Attorney General's reliance on *Bittaker*, *supra*, 48 Cal.3d 1046. There, Lawrence Bittaker and Roy Norris kidnapped and murdered five teenage girls; most of the murders involved rape and torture. (*Id*. at pp. 1061-1062.) Norris testified against Bittaker pursuant to a plea bargain and provided a detailed account of their crimes. The physical evidence against Bittaker, which corroborated Norris's testimony, was overwhelming. (*Id*. at pp. 1063-1067.) Residents of the motel where Bittaker lived also testified against him. One such resident, 17-year-old Christina Dralle, testified Bittaker "showed her photographs of [the third victim] and four other girls, and said, 'The girls I get won't talk any more.' On another occasion she heard a tape, apparently the recording of the rape of [the third victim], which [Bittaker] played

19

for her." (*Id*. at p. 1068.) Dralle also "testified that when she rejected [Bittaker's] advances, he pulled a gun and said, 'you wouldn't argue if I pulled the trigger.' " (*Id*. at p. 1097.) The defense sought to impeach Dralle's testimony with evidence she had falsely accused two other men of molestation. Our Supreme Court held exclusion of this evidence under section 352 was not an abuse of discretion, explaining: "The value of the evidence as impeachment depends upon proof that the prior charges were false. This would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges. Such a proceeding would consume considerable time, and divert the attention of the jury from the case at hand." (*Ibid*.)

Unlike *Bittaker*, *supra*, 48 Cal.3d 1046, where Dralle was a relatively minor prosecution witness, E.'s testimony was the critical evidence against defendant. And while the prior accusations in *Bittaker*, if proven to be false, would tend generally to impeach Dralle's credibility as a witness, there was no indication these accusations were made under sufficiently similar circumstances for the jury to conclude Dralle would possess a motive to fabricate her testimony against Bittaker. Thus, the evidence proffered in *Bittaker* was far less probative than that proffered in this case. There was also no indication in *Bittaker* as to what evidence the defense intended to present to prove the prior accusations were false. Assuming this evidence was testimony from the other two men denying Dralle's prior accusations against them, allowing such evidence would certainly result in a mini-trial on an issue collateral to the case. But here, the evidence sought to be introduced was simply an admission from E. she had falsely accused a former teacher of molestation because she was mad and wanted attention. Of course, the jury would be required to decide whom it believed, E. or A.M. But again, unlike *Bittaker*, E.'s testimony was critical to the prosecution's case against defendant. The excluded evidence was highly relevant to her credibility. Allowing the excluded

20

evidence to be presented would not have consumed considerable time. Nor would it have diverted the jury's attention from the case since E.'s credibility was the critical question in the case.

Nor is this case analogous to *People v. Tidwell*, *supra*, 163 Cal.App.4th 1447, in which we held the trial court did not abuse its discretion in excluding evidence of prior rape accusations where the only evidence the prior accusations were false was the fact the victim "made inconsistent statements" concerning the prior incidents. Based on "the weak nature of the evidence of falsity of the complaints and the confusion of the jury and consumption of time it would have engendered for the parties to embark on the task of litigating the truthfulness of [the victim's] prior complaints," we found no abuse of discretion. (*Id*. at p. 1458.) Here, the inconsistent statement sought to be admitted was E.'s admission the prior molestation accusation was a lie. This is strong evidence of falsity.

Finally, we conclude the error was not harmless and requires reversal. "An appellate court may not order a new trial on the ground of the erroneous exclusion of evidence unless the record shows that, absent the error, there is a reasonable probability that the outcome would have been different." (*People v. O'Shell* (2009) 172 Cal.App.4th 1296, 1310; Cal. Const., art. VI, § 13; § 354.) The sole issue before the jury was credibility. The excluded testimony could have hurt E.'s credibility and in turn bolstered defendant's credibility to such an extent the jury would have entertained a reasonable doubt concerning the guilt of defendant. "[W]here, as here, the resolution of [defendant's] guilt or innocence turned on his credibility vis-a-vis that of the victim, it is reasonably probable that the verdict would have been in [defendant's] favor had the excluded evidence been admitted." (*People v. Adams* (1988) 198 Cal.App.3d 10, 19 [reversible error to exclude evidence the victim had on two previous occasions falsely accused others of rape].)

21

## II

### *Forfeiture*

Defendant's further assertion the trial court violated his right of confrontation under the federal Constitution is forfeited for failure to raise it below.  And while we have discretion to reach this claim despite the forfeiture, our conclusion the case must be reversed for state law evidentiary error renders discussion of the constitutional claim unnecessary.

### DISPOSITION

The judgment is reversed.


       HOCH    , J.


We concur:


      BUTZ    , Acting P. J.


   MURRAY   , J.

22