Filed 8/24/21  P. v .Anguiano CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B304946 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA147230) |
| v. | |
| DARIO ANGUIANO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Debra Cole-Hall, Judge.  Reversed.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Joseph P. Lee and Jaime L. Fuster, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted Dario Anguiano of kidnapping, felony corporal injury, misdemeanor contempt of court and misdemeanor dissuasion of a witness.  The trial court sentenced him to a term of five years in state prison.

The charges primarily arose out of a November 2017 altercation between Anguiano and his former paramour, Yolanda V., with whom he shared a child.  The incident resulted in questionable injuries and was initially filed as a misdemeanor.

In March 2018, however, Yolanda contacted detectives and told them that Anguiano, an electrician who had no prior record or reported incidences of domestic violence, had threatened her father in Mexico, claiming he was part of a drug cartel that could carry out this threat.

Based on the drug cartel references, Anguiano was re-arrested, and a six-count information was filed against him, now with several felony counts arising out of the original November 2017 incident.  At trial, the threat charge that prompted Anguiano's re-arrest was dismissed for lack of evidence.  Thereafter, the jury returned a mixed verdict.

On appeal, Anguiano raises various claims of error, including the exclusion of two areas of significant impeachment evidence: (1) that Yolanda, who began working with a victim's advocacy group in January or February of 2018, became aware of a special visa (and path to citizenship) available to immigrant victims of serious offenses who cooperate with law enforcement, and may have changed her testimony accordingly; and (2) that shortly after the November 2017 incident, and prior to her threat allegations, Yolanda made several recorded messages in which she sought out meetings with Anguiano and stated she would drop the charges in exchange for financial support.

We hold that the trial court erred by unduly narrowing the allowable cross-examination of Yolanda, whose testimony was crucial to the prosecution's case and who possessed a significant motive to fabricate and/or embellish her testimony. Yolanda's direct testimony clearly placed her immigration status in issue, which reduced any possible prejudice from allowing cross-examination on that topic. Further, with no clearly visible injuries, witness credibility was paramount, making cross-examination especially important.

Accordingly, we find these errors prejudicial and reverse.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Prosecution's Case-in-chief

1. *November 25, 2017: Counts 1 to 3 (Kidnapping, Corporal Injury to Domestic Partner or Parent of Child, and False Imprisonment by Violence)*

Yolanda and Anguiano dated for about two years.[2] Anguiano, who was 20 years older than Yolanda, was married to another woman. In June or July 2016, Yolanda told Anguiano's wife about the affair, and showed her photos. Yolanda believed Anguiano was going to divorce his wife. In October or November 2016, Yolanda became pregnant with Anguiano's child.[3]

---

[1] In light of our disposition, we need not address Anguiano's other assertions of error.

[2] Yolanda and Anguiano are related through marriage; her aunt is married to his uncle.

[3] Yolanda at one point testified that Anguiano directed her to stop using birth control because he wanted a child. At another point she testified that it was a mutual decision and that she understood he was going to divorce his wife, since she had told his wife about the affair.

Anguiano and Yolanda continued to see each other, and he provided her with financial support. By November of 2017, however, they had ended their relationship.

On November 25, 2017, Anguiano sent angry text messages to Yolanda and then showed up at her place at around 3:00 or 4:00 p.m. The angry texts were about Yolanda posting a photograph of herself on social media. Anguiano spoke with Yolanda for about half an hour, and then left.

Later that evening, Yolanda attended a family function, asking her next door neighbor, Carina Hernandez, to babysit her and Anguiano's three-month-old baby. Carina agreed and at around 9:00 p.m. she went to Yolanda's apartment, bringing her two young children with her.

A little after 10:00 p.m., Anguiano arrived at Yolanda's residence and knocked at the door. Carina peeked out the window. She recognized Anguiano as the baby's father, but did not know him well.[4] She refused to open the door, and called Yolanda. After Anguiano attempted to enter through the baby's bedroom window, Carina grabbed the baby and opened the door. Anguiano asked where Yolanda was and demanded the baby, calling Carina insulting names. Carina refused to give him the baby.

Anguiano walked over to Carina and her husband Jose Santos's apartment and demanded he get his wife out of Yolanda's apartment. Jose followed Anguiano to Yolanda's home. Anguiano continued acting aggressively, insulted Carina, and

---

[4] During the three months she had lived next door to Yolanda, Carina had seen Anguiano several times but did not speak with him. She had no impressions of him either way before this incident.

asked for the baby. Carina was on the verge of tears. Jose called 911 in front of Anguiano. Jose told police he was having problems with a neighbor who was acting aggressively because the mother of his baby was not home. After calling 911, Jose took his own children home and Carina stayed in Yolanda's apartment with the baby. Eventually, Carina allowed Anguiano to have the baby.

Around 10 to 20 minutes later, Yolanda arrived at the front gate to the triplex. Anguiano asked her with whom she was, and accused her of lying. She told him to calm down. While holding the baby with his left arm, Anguiano grabbed Yolanda by the neck and hair and held onto her hair as they walked back to the entrance of Yolanda's apartment.

Once inside, Anguiano placed the baby on the bed and asked Yolanda why she was lying to him. Yolanda replied that she would tell him if she were ever with somebody else. Anguiano became "really upset" and put one hand on her throat and pressed hard. She asked him to let her go, and he complied, but continued insulting her. Anguiano had never acted violently with Yolanda. He put a fist near her head and told her to shut up. At this point, the police arrived.

Los Angeles County Sheriff's Department Deputy Jason Guillen was dispatched to the scene. When he arrived, Jose directed him to Yolanda's residence. Deputy Guillen heard no sounds from the house, and knocked on the door. Yolanda opened it within seconds. She was crying and had "redness to her neck." Photographs taken by Deputy Guillen of Yolanda's neck did not show the degree of redness.[5] Yolanda reported Anguiano had

---

[5] The photos were taken 45 minutes after the incident. According to Yolanda, the redness was gone the next day, but she

grabbed her by the neck while the two were inside. She also stated that he had grabbed her hair and dragged her about 20 to 30 yards into her residence.[6]

After interviewing Yolanda, Carina, and Jose, the deputies placed Anguiano under arrest. Protective orders were issued against Anguiano, prohibiting him from contacting Yolanda.

2. *January 1 through March 12, 2017: Counts 4 to 6 (Criminal Threats, Dissuading a Witness, and Contempt of Court)*

In December of 2017, Yolanda and Anguiano exchanged some messages through Yolanda's sister regarding support for Yolanda and the baby. Although there was no child support order in place, Anguiano had been giving money to Yolanda to help her and the baby, but had stopped doing so after his arrest.

On January 31, 2018, Yolanda went to the Sheriff's Department Century Station and reported that Anguiano had contacted her the previous day, in violation of a restraining order. Yolanda brought a video of a six-minute phone conversation. The deputy at the front desk booked the video into evidence, after confirming that the restraining order prohibited electronic communication. No further action was taken.

On March 12, 2018, Yolanda contacted detectives and reported that Anguiano had called her father in Mexico and threatened to kill the family, stating that he could get it done and that he was part of a drug cartel. The police came out to Yolanda's home and made a report. Anguiano was then re-

---

still felt pain. The police report of the incident made no mention of any redness on Yolanda's neck.

[6] Jose estimated the distance to be about 35 to 40 feet while Carina estimated the distance at about 45 feet.

arrested and subsequently charged in a six-count Information for conduct based on the November assault and the ensuing phone calls.[7]

## B.    Defense Case

Claudia Anguiano, Anguiano's wife, testified she had been married to him since 1997 and had been with him since 1994. They have four children together.  In August 2016, Yolanda came over to Claudia's home and told Claudia that she had been in a relationship with Anguiano for a year.  Yolanda had pictures of her with him to prove their relationship.  Subsequently, Yolanda called Claudia numerous times and asked whether there was a divorce pending.  Claudia tried to get a restraining order against Yolanda.

Anguiano testified that he never told Yolanda that he was going to divorce his wife and denied he wanted to have a child with her.  She did not tell him when she stopped using birth control.  By November 2017, Anguiano was no longer in an intimate relationship with Yolanda.  He had agreed to give her financial support in exchange for her not bothering his family; Anguiano signed a lease for Yolanda's apartment and gave her money for rent and other expenses.

---

[7] The record indicates that the November 2017 incident was initially charged as a misdemeanor, and Anguiano was released from custody.

The March 12, 2018 telephone call to Yolanda's father yielded two felony counts: (1) criminal threats (count 4); and (2) dissuading a witness or threat (count 5).  At trial the criminal threat charge was dismissed for lack of evidence, but the dissuasion charge in count 5 was retained (and the Information was amended) after Yolanda testified to additional phone calls made by Anguiano to her.

7

On November 25, 2017, Yolanda called Anguiano and asked for an advance on December's rent.  She wanted the money earlier than usual because she wanted to fix her hair extensions, which had been removed during a fight about a week or two earlier.[8]

Anguiano, an electrician, was on emergency-call duty that day, without a fixed schedule.  Anguiano told Yolanda that he did not have the money yet but agreed to stop by her place with donuts she wanted that afternoon.[9]  They further agreed he would stop by later that evening with some money for her.  Anguiano wanted to bring her the money that evening because he had a family event the following day and knew that Yolanda would be calling him if he did not give her the money.

That night, around 10:30 p.m., Anguiano arrived at Yolanda's house to drop off some money.  He stopped his truck in the middle of the street and called Yolanda.  She did not answer.  He then parked his truck and went to her apartment.  He knocked on the door, but there was no response.  After knocking for about three minutes, he tried to open the door, which was unlocked.  He went to the bedroom and saw the baby in the crib crying.  There was nobody else in the residence.

Anguiano went to look for Yolanda and saw Carina coming in.  Carina appeared surprised.  Anguiano asked where Yolanda

---

[8] During cross-examination, Yolanda acknowledged she got hair extensions put in that day, and further acknowledged she had been in a fight about two weeks earlier.  She denied, however, that the fight had involved any hair-pulling and testified instead that she obtained bruises on her hands from the fight.

[9] During cross-examination, Yolanda confirmed he brought donuts during his afternoon visit.

was, and Carina replied that Yolanda was out and that she was babysitting.  Anguiano complained about finding the baby alone and told Carina to call Yolanda and tell her that he was there.  Carina told him she had gone home to check on her own children.  Anguiano told her that she could leave, as he was going to take care of the baby.  Instead, Carina stayed and called Yolanda.  Anguiano also talked to Yolanda and told her about the baby being left alone.  She told him not to take the baby and that she was going to be back soon.

At this point, Jose came home and told Anguiano that he was going to call the police.  Anguiano said that was fine, and went to the front of the property with the baby to wait for Yolanda.  About 10 minutes later, Yolanda arrived and loudly asked why he was there.  He replied he was there to bring her money.  He told her about the baby being left alone, and noted his money was to take care of the child and not to leave him with people who did not care about his well-being.[10]

Yolanda suggested they go inside her home to talk about the baby.  Anguiano followed her to her place and went straight to the bedroom and placed the baby in the crib.  Yolanda closed the front door and sat on a couch.  Anguiano sat at the dining table.  Yolanda screamed at him that he had no right to question her about the baby, and he disagreed as he was giving her money for the baby.  He also threatened to get custody of the child.  She

---

[10] Deputy Guillen testified that Anguiano told him that night that Yolanda had left the baby with a stranger.  During cross-examination, Yolanda acknowledged that Carina was not her regular babysitter.  She also testified that her other two children (not related to Anguiano) were with their grandparents that night, but that she asked Carina to take care of her baby shortly before she went out.

told him not to do that.  This was not their first conversation about how she did not take good care of her children.

He mentioned the police were on their way, and she started crying.  The police arrived within a minute.  He never grabbed Yolanda by the neck or her hair.  In fact, he had never touched her in a violent way and had never been accused of domestic violence.

Anguiano further denied ever threatening Yolanda's family.  Between January 20 and March 12, 2018, he called Yolanda a few times.  He did so because she called from a blocked number and told him to call her back about the baby.  She told him that he should plead guilty because he was not going to get jail time.  He refused.  On about four or five occasions, Yolanda asked Anguiano to meet her in person.  He never did.

## C.    Charges and Verdict

On August 27, 2019, the People filed an amended information charging Anguiano with kidnapping (Pen. Code,[11] § 207, subd. (a); count 1), corporally injuring the mother of his child (§ 273.5, subd. (a); count 2), false imprisonment by violence (§ 236; count 3), criminal threats (§ 422, subd. (a); count 4), dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 5), and misdemeanor contempt of court (§ 166, subd. (c)(1); count 6).  At the conclusion of the prosecution's case-in-chief, the trial court granted a defense motion to dismiss count 4 for lack of sufficient evidence. [12]

---

[11] Undesignated statutory citations are to the Penal Code.

[12] The original information was filed on September 7, 2018.  As previously noted, the information was amended during trial to conform to proof regarding the relevant dates of acts underlying the charges in counts 5 and 6.

On August 29, 2019, a jury found Anguiano guilty of kidnapping, corporally injuring the mother of his child, and misdemeanor contempt of court.  The jury acquitted Anguiano of false imprisonment.  As to count 5, the jury found Anguiano not guilty on the greater offense of dissuading a witness by force or threats but guilty of the lesser included offense of misdemeanor dissuading a witness.  (§ 136.1, subds. (a), (b).)

On January 22, 2020, the trial court sentenced Anguiano to the midterm of five years in state prison on the kidnapping charge.  The court imposed one-year terms on counts 5 and 6 to run concurrently to the sentence on count 1; the court stayed the sentence on count 2 under section 654.

## DISCUSSION

Anguiano contends the trial court erred in precluding trial counsel from inquiring into matters that were highly relevant both to Yolanda's credibility and to the various charges.  He further argues that the rulings, either individually or cumulatively, resulted in prejudice necessitating reversal.  We agree the trial court committed evidentiary error in two respects and, in light of the overall record, find the error prejudicial.

## A.    Standard of Review and Relevant Legal Principles

We review the trial court's rulings on the admission and exclusion of evidence for abuse of discretion (*People v. Harrison* (2005) 35 Cal.4th 208, 230), keeping in mind that a trial court abuses its discretion when it makes an error of law (*People v. Yates* (2018) 25 Cal.App.5th 474, 482).

A party may cross-examine a witness about the witness's motive and bias.  (Evid. Code, § 780, subd. (f).)  " 'The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of

11

his testimony." ' " (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1051 (*Villa*), quoting *Davis v. Alaska* (1974) 415 U.S. 308, 316 [94 S.Ct. 1105, 39 L.Ed.2d 347]; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 207.)

**B.      The Trial Court Erred by Restricting Evidence and Examination into Yolanda's Immigration-related Motivations**

Anguiano contends the trial court erred by restricting inquiry into whether Yolanda was aware of any immigration-related benefits that might arise out of her cooperation in this case, and by precluding defense counsel from calling a victim's advocate to testify as to whether she was assisting Yolanda with such immigration benefits.  The People counter that the trial court had discretion to exclude impeachment evidence that was more prejudicial than probative, and that "the jury was well aware of Yolanda's uncertain immigration status, and how such status played a role in her relationship with [Anguiano] before and after November 2017."

1.      *Relevant Facts*

Prior to trial, defense counsel noticed his intention to introduce evidence that Yolanda was an undocumented worker. The trial court tentatively ruled the evidence inadmissible, but subject to reconsideration.

During direct examination, Yolanda testified that between January and March of 2018, Anguiano made several phone calls during which he threatened her family and also threatened to report her to immigration and have her deported if she did not drop the charges.  During cross-examination, counsel sought to ask Yolanda about the Los Angeles County District Attorney's policy of helping cooperating witnesses with their immigration status.  The court ordered the parties to approach the bench.

12

At sidebar, defense counsel showed the trial court a "special directive" issued to all deputy district attorneys in Los Angeles. The directive outlines the federal "U Visa" eligibility guidelines, providing a pathway for certain crime victims to gain permanent resident status, if certified as having been helpful in the investigation and prosecution of a qualifying crime.[13] The list of qualifying crimes is limited, including only: "*domestic violence*; sexual assault; rape; torture; female genital mutilation; *kidnapping*; *false imprisonment*; extortion; human trafficking; prostitution; felonious assault; manslaughter; murder; *witness tampering*; *obstruction of justice*; perjury; or the attempt, conspiracy or solicitation to commit any of the above-mentioned crimes." (Italics added.)

Upon request for certification by a victim or victim's advocate, the deputy district attorney assigned to the case will prepare a memorandum to the director regarding, inter alia, the victim's degree of helpfulness in the prosecution. So long as the request for certification is made after the date of conviction, the department's policy is that such requests need not be disclosed to the defense.

After reviewing the directive, the trial court asked counsel why the document was relevant. Defense counsel proffered that he believed that Yolanda had been informed of the policy. Trial counsel added that he believed she was communicating with the victim's advocates about immigration assistance once the case was resolved, and that this gave her motive to assist the prosecution. The prosecutor responded that Yolanda had "not

---

[13] The U Visa is a new category of visa created under the Battered Immigrant Women Protection Act of 2000 (BIWPA). (See 8 U.S.C. § 1101(a)(15)(U); 8 C.F.R. § 214.14 (2020).)

contacted anyone about that from the D.A.'s office." The trial court stated that defense counsel could ask Yolanda if the district attorney had "made any promises to her regarding her testimony." When defense counsel attempted to respond, the trial court cut off further argument.

Defense counsel then asked Yolanda whether she was familiar with the U Visa. She responded, "I don't know anything about that. I'm only here so that justice can be done. I'm not aware of anything else."

The court called a break at this point, and outside the jury's presence, counsel inquired into the identity of the victim's assistant, who was appearing with Yolanda. The assistant identified herself as a "Community Care Advocate at the Los Angeles Center for Law and Justice" (LACLJ).

Back before the jury, defense counsel asked Yolanda when she became acquainted with the LACLJ. Yolanda responded that she did not remember, but she came to know them through her "welfare social worker." When pressed for a rough time frame, she believed it might have been around January or February of 2018. When the court later asked her when she contacted the LACLJ, she responded by stating she contacted them to help her with physical and legal custody of her son. When defense counsel queried whether the LACLJ's "primary mission is assistance with immigration," the court ordered counsel to cease this line of questioning.

When defense counsel asked Yolanda whether immigration was "a factor" in her decision to contact LACLJ, Yolanda did not respond directly, instead stating that she had sought out their services in her custody case "and also with a restraining order." When asked if LACLJ was helping her obtain a U Visa, the court sustained the prosecutor's objection.

14

During the defense case, Anguiano testified that Yolanda had asked him to get a divorce and "fix her immigration status." Defense counsel, thereafter, attempted to call the LACLJ representative to the stand. The court requested an offer of proof. Counsel proffered the representative would confirm she was helping Yolanda with the process of obtaining a U Visa, and that the visa was something of a benefit that Yolanda would receive by being cooperative in the prosecution of this action. The prosecutor objected, arguing Yolanda knew "nothing about the U Visa" and was "not doing it for a U Visa." Defense counsel responded that Yolanda was not being truthful.

The court asked counsel whether he wanted to ask the advocate if "they promised Yolanda V. anything for testifying today?" After counsel responded that this was not the correct query and he instead believed the LACLJ representative would confirm that the center was assisting Yolanda with the process of obtaining a U Visa, the court sustained the prosecutor's objection. The representative was never called as a witness.[14]

2.    *Analysis*

Defense counsel proffered that the U Visa process was relevant as a potential motive to assist the prosecution and, further, that the LACLJ representative would testify that she was assisting Yolanda with the process of obtaining a U Visa. The trial court nevertheless limited any inquiries solely into whether the prosecutor or LACLJ representatives had made any

---

[14] After confirming that he was not permitted to call the LACLJ representative as a witness, defense counsel had the court enter her full name on the record.

15

*promises or guarantees* of immigration benefits.  This was error.[15]  We find *Villa* instructive.

In *Villa,* the defendant was charged, inter alia, with corporal injury after he was pulled over by police and his girlfriend was found in the car seriously injured and bleeding.  (*Villa, supra,* 55 Cal.App.5th at pp. 1044-1046).  At trial, the defendant sought permission to cross-examine the victim about the circumstances behind her request for a U Visa.  (*Id.* at pp. 1047-1048.)  The trial court denied the request, but only after ascertaining that the victim first learned of the U Visa program *after* the preliminary hearing and after determining that her trial testimony was consistent with her testimony at the preliminary hearing.  (*Id.* at p. 1048.)

In affirming the trial court's ruling on appeal, the court first noted that the evidence regarding the U Visa "was 'relevant to show motive and/or bias and was relevant to [the victim's] credibility.' "  (*Villa, supra,* 55 Cal.App.5th at p. 1051; cf. *U.S. v. Blanco* (9th Cir. 2004) 392 F.3d 382, 392 ["Any competent lawyer would have known that [a cooperating witness's] special immigration treatment by the [Immigration and Naturalization Services] and the [Drug Enforcement Administration] was highly relevant impeachment material"].)

---

[15] On appeal, the People perpetuate this error by noting that the prosecutor asserted during a post-conviction hearing that she did not suggest the U Visa application to Yolanda until after Anguiano had been convicted and thus "[t]his post-trial event could not have retrospectively affected Yolanda's credibility as a witness."  However, as we discuss, the relevant question is whether Yolanda was made aware of the U Visa benefit, not whether she was promised or guaranteed the benefit.

16

The court then reasoned that the trial court did not abuse its discretion in excluding the evidence under Evidence Code section 352 because: (1) the victim's testimony following her discovery of the U Visa procedure "simply repeated what she said earlier" thereby leaving "very little reason to believe discovering she could obtain a U Visa motivated her to testify falsely," (2) "the physical evidence strongly supported the jury's finding that [she] was a victim of domestic abuse" given that she was found inside the defendant's vehicle with "several serious and obvious injuries"; and (3) "the admission of the [U Visa] evidence created at least *some potential* for prejudicing the jury against [the victim]."[16]  (*Villa*, *supra*, 55 Cal.App.5th at pp. 1052-1053, italics added.)

The facts of this case stand in stark contrast to *Villa*.  First, the trial court here did not exclude the evidence under Evidence Code section 352, but instead determined that only inquiries regarding actual promises or guarantees of immigration benefits would be *relevant* and admissible.  The evidentiary rules are not so narrowly drawn.[17]

---

[16] The appellate court, like the trial court, found the risk of prejudice low because the jury had already learned the victim was an undocumented alien.  (*Villa*, *supra*, 55 Cal.App.5th at pp. 1048, 1053.)

[17] As explained in *People v. O'Shell* (2009) 172 Cal.App.4th 1296, "a ruling under Evidence Code section 352 is expressly committed to the *trial court's* discretion by statute" and "[t]here is no provision in this statute or in the case law for an appellate court to conduct the requisite Evidence Code section 352 balancing in the first instance . . . ." (*Id.* at p. 1309.)  To the extent the analysis might be different if the evidence would have been excludable under Evidence Code section 352 as a matter of

Evidence Code section 780 provides that in determining credibility, a jury may consider "*any* matter that has any tendency in reason to prove or disprove the truthfulness" of testimony, including "*[t]he existence or nonexistence of a bias, interest, or other motive.*"  (*Id.*, subd. (f), italics added.)[18]

Defense counsel proffered that Yolanda was aware of the U Visa program, and that the LACLJ was assisting her in that regard.  The district attorney's policy on the U Visa program states that a victim or victim representative may request a certification of helpfulness, and further states that a victim's advocate may be able to provide "additional information regarding the victim's helpfulness."

Even had Yolanda not learned of the U Visa program directly from the district attorney's office, counsel's proffer that she did learn about it from the LACLJ representatives (who were with her throughout trial and had been assisting her with legal matters since January or February of 2018) was neither refuted nor explored.

We reject the People's assertion that the trial court's ruling was correct because "as in *Villa*, Yolanda's testimony was

---

law, no such showing has been made here.  (*O'Shell*, *supra*, at p. 1309.)

[18] In issuing its final holding, the *Villa* court stated that "where an abuse victim has provided the same basic testimony about suffering abuse before and after *learning* of the U visa program, the probative force of the evidence . . . is significantly outweighed by the risks of prejudice . . . ."  (*Villa*, *supra*, 55 Cal.App.5th at p. 1054, italics added.)  Thus, the court did not identify the relevant event as the *filing* of the U Visa application, but the moment the victim learned of the availability of such a benefit.

consistent with her statements to law enforcement at the crime scene." Unlike *Villa*, the timing of Yolanda's additional revelations, combined with the paucity of physical evidence of abuse, highlight the importance of full cross-examination.

Although Yolanda was evasive when asked for a timeframe of her contacting the LACLJ, she estimated it was around January or February of 2018. Only afterwards, on March 12, 2018, did Yolanda call detectives and report that Anguiano had threatened her father's life. Only then did she indicate that he was part of a drug cartel that could carry out such a threat. Yolanda herself testified that her March 12, 2018 report of Anguiano's threat caused the police to realize this matter was a serious one.

On September 7, 2018, an information was filed with three felony counts, escalating the November 2017 incident, which had initially filed as a misdemeanor. Yet the criminal threat count, based on the March 12, 2018 report, was dismissed at trial for lack of evidence.

Yolanda's trial testimony also resulted in the inflation of charges by including statements not previously reported. Both count 4 (criminal threats) and count 5 (dissuading a witness) in the original information were based on the purported threats to *her father* on March 12, 2018. Notwithstanding the dismissal of count 4, the charge in count 5 remained because, at trial, Yolanda testified to four or five additional threatening calls allegedly made by Anguiano between January and March.

On the other hand, no threats by Anguiano were reported to law enforcement when she came to the Century sheriff's station on January 31, 2018 (and brought a six-minute video of her phone call with Anguiano) even though Yolanda testified at trial that he threatened to kidnap her brother during that call.

19

Yolanda also later embellished facts in relation to the November 2017 incident. That is, Deputy Guillen testified that when he knocked on Yolanda's door she responded within seconds and that he heard no sound of any locks being turned. Yolanda, however, testified that Anguiano locked the door after they entered the house, and that *he* was the one who answered the door when police arrived. These facts formed the basis for the felony false imprisonment charge. We note that false imprisonment is one of the crimes qualifying for U Visa certification.[19]

It must be plainly stated that Yolanda placed her immigration status in the front of the jury by testifying that Anguiano threatened to report her to immigration—while Anguiano testified that she wanted him to divorce his wife to fix her immigration status—thus, Yolanda's immigration status was squarely before the jury as a material issue in this case.[20]

---

[19] Misdemeanor false imprisonment was offered as a lesser included offense to the felony false imprisonment charge in count 3. The only lesser offense offered to the jury in relation to the kidnapping charge, was also misdemeanor false imprisonment. During deliberations, the jury expressed confusion over the same lesser offense being charged under count 1 and count 3, and sought clarification on the "difference in definitions." After being informed that definitions were the same, the jury acquitted on the count 3 false imprisonment charge and found Anguiano guilty of kidnapping as charged in count 1.

[20] To the extent the People contend the trial court's ruling should be affirmed under Evidence Code section 351.4, we disagree. The statute does not, as the People suggest, wholly prohibit the admission of immigration-related evidence but instead states that "evidence of a person's immigration status shall not be disclosed in open court . . . unless the judge presiding

20

To the extent that Yolanda was made aware that her cooperation in the investigation or prosecution of certain enumerated offenses could provide an avenue towards permanent residence and citizenship, such knowledge would have provided a strong ulterior motive to fabricate or exaggerate any criminal charges leveled against Anguiano. (*Villa, supra,* 55 Cal.App.5th at pp. 1049-1052.) The trial court erred by ruling that only actual promises of immigration benefits made to Yolanda would be relevant to her credibility, and *Villa* does not provide a basis for affirming the trial court's ruling.

## C. The Trial Court Erred by Excluding Yolanda's Recorded Statements

Anguiano contends the trial court erred by excluding inquiry into, and supporting evidence of, several recorded statements made by Yolanda in which she directed her sister to seek out a meeting with Anguiano and offered to drop the charges in exchange for his financial assistance. The People counter that the trial court properly exercised its discretion in excluding the recordings under Evidence Code sections 352 and 356, as they were confusing and out of context.

### 1. *Relevant Facts*

In addition to testifying about the January 2018 call she reported to police, and the purported threat made to her father in March (as charged in the original information), Yolanda testified

---

over the matter first determines that the evidence is admissible." (*Id.*, subd. (a).) Moreover, Evidence Code section 351.4 expressly states that it does not "[p]rohibit a person . . . from voluntarily revealing his or her immigration status before the court." (*Id.*, subd. (b)(3).) This is what occurred here when Yolanda, like the victim in *Villa*, testified to her undocumented status in open court—prior to any queries about the U Visa process.

21

that Anguiano made four or five additional calls to her between January and March of 2018, threatening to harm her family and have her deported if she did not drop the charges.

During cross-examination, Yolanda denied communicating with Anguiano through family members after the restraining order was in effect. When asked if she ever gave her sister recorded messages to relay to Anguiano, she answered, "I don't know."

At sidebar, defense counsel explained that on December 27, 2017, Yolanda delivered a series of audio messages to her sister, telling her to arrange a meeting with Anguiano. Counsel had copies of the recorded statements, but would need to prepare transcripts.

Counsel proffered that the recordings showed Yolanda asking to arrange a meeting, offering a settlement, promising she would not tell the police about their meeting, and that she would get rid of the criminal case. Counsel stated the messages were relevant to whether Yolanda was actually in fear of him and whether she was inviting him to violate the restraining order.

Outside the presence of the jury, Yolanda was called back to the stand for voir dire on the matter. Yolanda agreed she had previously used a phone app called "WhatsApp" to communicate with her sister. When asked if she had used the app to ask her sister to reach out to Anguiano, Yolanda responded, "I do not remember." The trial court asked Yolanda if she ever made a recording with her sister, to give information to Anguiano. Yolanda replied, "Not that I remember." The court asked whether she ever told her sister to tell Anguiano to meet her somewhere; Yolanda responded that she did not understand the question. The court asked: "Did you create a recording asking your sister to tell [Anguiano] to meet you somewhere?" Once

22

again, Yolanda responded, "I don't remember." Counsel noted it was up to the court to determine whether Yolanda's answers indicated a "bona fide lack of recollection."

The court stated that, for the time being, counsel could ask Yolanda whether she made communications directing Anguiano to meet her somewhere and, depending on the answer, counsel might or might not need to play the recordings in rebuttal.

The jury was called back, and Yolanda again testified she did not remember whether she had used WhatsApp to ask her sister to communicate with Anguiano following issuance of the restraining order. After counsel asked if she had suggested that she and Anguiano could meet at her uncle's house, Yolanda responded that Anguiano had reached out to her sister stating Yolanda was not letting him see the child, and she had responded if he wanted to see the child so much he could see the baby at her uncle's house. She denied making any references to lifting the restraining order or dropping the charges.

The following Monday, counsel asked Yolanda a second time if she used voice recording to communicate with Anguiano, via her sister. Yolanda agreed she had sent voice messages through her sister, but stated the recordings were in response to messages originating from Anguiano. Counsel read one of the messages aloud, in which she stated, "do you believe I'm going to be a dummy, too. . . . [T]ell him to say where to go and I go." The prosecutor objected.

Back at sidebar, the court asked counsel if he was extracting messages from the "middle of a conversation." Counsel noted the recorded statements were each separate voice message files, made by Yolanda on December 27, 2017, and that Yolanda's sister had forwarded them to Anguiano. Counsel noted they were more akin to emails. The voice could be authenticated

23

by Yolanda, or Anguiano, and Yolanda was free to explain the context of her messages.

The prosecutor argued it would be unfair to introduce Yolanda's statements, because, according to Yolanda, Anguiano had initiated the conversations and threatened Yolanda and/or her sister.[21]

After hearing the parties, and reading the transcribed messages, the court stated that, absent the "entire conversation," it would preclude further inquiry on the topic. When Anguiano took the stand in his own defense, counsel moved for reconsideration of that ruling. Counsel stated Anguiano would be able to verify Yolanda's voice and to confirm how he received the recordings.[22]

The trial court noted its greater concern was that Yolanda's statements were ambiguous. The court noted that Yolanda says at some point "I'll remove everything" and it was not clear to what she was referring and how this was relevant to this case.

---

[21] Although the prosecutor represented several times that she had spoken with Yolanda about these messages and that Yolanda told her that they failed to reflect Anguiano's threats to her or her sister, Yolanda had previously testified that this conversation took place "before his threatening phone calls and all of that." In their answering brief, the People expressly acknowledge that Yolanda confirmed the recorded messages preceded any threats by Anguiano.

[22] The prosecutor again asserted that the calls omitted threats that were made, stating: "I asked [Yolanda] about this, and she said that, first of all, [Anguiano] contacted the sister. So it's not even—and the message on the—from [Anguiano] was threatening, that he's telling the sister to contact [Yolanda]."

24

Counsel responded that the meaning could easily be clarified by Yolanda, "who recorded these conversations, who hit start, recorded every word she wished to record, and then hit stop." Counsel noted the statements corroborated the defense's theories regarding Yolanda's financial motives (here attempting to extort money in exchange for dropping the charges) and countered the prosecution's narrative that Yolanda was afraid of Anguiano. As such, the recordings constituted proper impeachment material.

The court ruled it was excluding the recordings under Evidence Code section 352 analysis, finding any probative value was outweighed by the potential for confusion and time consumption. The court noted "the rule of completeness is important here" and required the entire conversation so that the topic of the conversation could be known.[23]

---

[23] The five excluded audio clips totaled 139 seconds. In the clips Yolanda instructs her sister to tell Anguiano: (1) that she wanted to meet up with him in person; (2) that she would not call the police; (3) that she wanted financial support, and if she received it, would "remove everything" and "close[ ] the case." (See, e.g., Exhibit D [unadmitted transcript of audio files]; clip 0 ["tell him he can say where to go"]; clip 1 ["we can see each other at my uncle['s] . . . house. I am not going to call the cops. . . . Just tell him that first we need to talk about it and come to an agreement . . . . I'm going to remove everything . . . . I can remove it for sure . . . . Like I will demonstrate to him like that I already closed the case"]; clip 2 ["Okay just tell him . . . [g]o to a notary so everything can be legal. That he is going to help me with the baby and everything. . . . And I will remove everything"]; clip 3 ["I don't know why he don't want us to see each other. . . . I'm not going to risk removing everything and later I will have nothing"]; clip 4 ["He has to trust me, he has no

2. *Analysis*

The recorded statements were relevant to the defense theory that Yolanda was motivated to pursue charges against Anguiano and/or fabricate allegations after he refused to meet with her and execute a financial agreement. (Evid. Code, § 780.) They were also relevant to corroborate Anguiano's versions of events and, thus, his overall credibility.

The recordings tend to show that, prior to reporting any threatening phone calls by Anguiano, Yolanda sought to meet with Anguiano and expressed frustration over his refusal to meet with her. They also discussed how she offered to "remove everything" and "close[ ] [out] the case" if he came to a notary and executed an agreement to provide financial assistance.

Had the jury heard the recordings (or counsel been allowed to further question Yolanda on these statements),[24] it could have reasonably concluded that her subsequent claims of threats by Anguiano were motivated by his failure to respond to her recorded demands. Additionally, the recordings would likely have supported Anguiano's testimony that he only contacted her after she left him messages to call about the baby, and that he never made any threats during those calls.[25]

---

other choice . . . and if he wants he can take me to the police station himself and he can wait outside so I can remove that"].)

[24] Yolanda's early, repeated claims of not remembering the recordings and later denials that she ever offered to drop the restraining order or charges, would allow the records to come in as prior inconsistent statements. (*People v.* Cowan (2010) 50 Cal.4th 401, 463 [non-responsive and evasive answers can constitute implied denial that amounts to inconsistency].)

[25] While the jury acquitted Anguiano of the felony crime of dissuading a witness with force or threats, it found him guilty of

In excluding the recordings, the trial court relied on the "rule of completeness." This was error. Evidence Code section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, *the whole* on the same subject *may be inquired into by an adverse party . . . .*" (Italics added.) (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1174 [discussing Evid. Code, § 356].)

Under Evidence Code section 356, the prosecution was free to question Yolanda and/or Anguiano regarding the complete context or meaning of these recordings, or to bring in other relevant evidence on the matter. But nothing in Evidence Code section 356 required the defense to locate copies of any other statements or recordings in order to render Yolanda's statements admissible—and the People cite no case suggesting that this is the law.[26] Accordingly, the trial court's reliance on the "rule of completeness," embodied in Evidence Code section 356 to exclude the recordings, was error. (*People v. Yates*, *supra*, 25 Cal.App.5th at p. 482 [trial court abuses its discretion if it makes an error of law].)

The trial court's invocation of Evidence Code section 352 was largely premised on the same concerns that prompted it to invoke the "rule of completeness"—i.e., that the recordings would confuse the jury because they were out of context. To the extent the court observed that Yolanda's use of the phrase "remove everything" was ambiguous on the question of whether she was

---

the misdemeanor dissuasion charge—which requires that the defendant knowingly seeks to prevent a witness from cooperating with the prosecution.

[26] Defense counsel noted there was no evidence these recordings were associated with other recordings.

offering to drop the charges, meaningful cross-examination on this topic should have been allowed. The failure to do so permitted a one-sided presentation of the evidence.

More specifically, in support of *her* claim that Anguiano called and threatened her on January 25th, Yolanda twice testified that he told her to "remove everything" and that he would kidnap her brother if she did not "remove that." The prosecutor followed up by asking what Yolanda took "remove" to mean, and whether he was "telling you to drop the charges?" Yolanda answered, "Yes." The prosecutor followed up with "[t]o drop this case?" Yolanda answered, "Yes."

The fact that Yolanda was permitted to testify to *her interpretation* of Anguiano's purported use of the phrase "remove everything," whereas the defense was prevented from exploring *Yolanda's* use of the exact phrase in recorded conversations prior to these purported threats, is unsupported. (*Villa, supra*, 55 Cal.App.5th at p. 1051 [trial court abuses Evid. Code, § 352 discretion if it is exercised in arbitrary or capricious manner].) [27]

For these reasons we hold that the trial court erred in excluding the recorded statements and/or precluding counsel from cross-examining Yolanda about her statements.

---

[27] We note that, throughout trial, the prosecutor interjected that she had spoken with Yolanda and that the recordings do not reflect the "threats" Anguiano made to her or her sister preceding the recorded statements. However, as the record shows—and the People acknowledge in their briefs (see fn. 23, *ante*)—Yolanda had testified that the messages or recordings took place prior to any threats by Anguiano. Further, the prosecutor's representation about what a key witness will or will not say is not a substitute for cross-examination.

**D. The Evidentiary Errors, Both Individually and Cumulatively, Were Prejudicial**

The errors identified above, both individually and cumulatively, resulted in prejudice. (See generally, *People v. Seumanu* (2015) 61 Cal.4th 1293, 1317 [applying prejudice standard under *People v. Watson* (1956) 46 Cal.2d 818, to assess combined effect of any evidentiary errors]; *People v. Duran* (1976) 16 Cal.3d 282, 293 [same].) Each area of inquiry was significant in identifying reasons why Yolanda might be motivated to file additional, and escalating, charges against Anguiano and, also, exaggerate the events of the November incident. Given the jury's mixed verdict, the jury clearly did not find Yolanda entirely credible.[28]

Nor do we find the testimony of Carina and Jose a sufficient basis to find harmless error. While both individuals corroborated Yolanda on certain points, they were not wholly independent witnesses or devoid of motive or bias. Besides their friendship/acquaintance with Yolanda, each had some type of confrontation with Anguiano that night. Jose acknowledged that the only time he called police that night was following his verbal confrontation with Anguiano; he did not call police again after

---

[28] In arguing trial court's exclusion of Yolanda's recordings did not result in prejudicial error, the People note she gave some testimony regarding her willingness to meet with Anguiano, and then comment: "*Interestingly*, the jury found appellant guilty of the lesser included offense of intimidating a witness (without force or a threat of violence) in count 5, which dealt with his actions after November 25." (Italics added.) However, the jury's verdict is not merely "interesting," it is *indicative*—i.e., the jury did not believe Yolanda on key points. The excluded impeachment material could have further tipped the scales towards acquittal.

Yolanda came home, or when she was led into the house by Anguiano.

Jose testified at trial that he was able to "peek[ ]" into Yolanda's house through a partially open curtain and saw Anguiano "grab [Yolanda] with force." Yet, he never mentioned this to the responding officer and, when later asked another question about the events occurring inside, responded, "I couldn't say that because they closed the door."

Similarly, while Carina claimed to have witnessed Anguiano pulling Yolanda's hair as he led her to the door, Jose testified that Carina was back in their house at this time.[29] Accordingly, the testimony of Yolanda's neighbors does not provide the type of reliable corroboration that might otherwise alter our prejudice analysis. (Cf. *Villa*, *supra*, 55 Cal.App.5th at pp. 1053-1054 [concluding any potential error in excluding impeachment evidence in domestic violence case was harmless where the victim was found with multiple, serious visible injuries, and the defendant claimed he was too drunk to remember what happened]; see also Exhibit Nos. 6, 7, 11 [photos with no clear injury visible].)

We therefore reverse the judgment of conviction.

---

[29] Jose and Carina had moved out of California by the time of trial. When Yolanda was asked whether she had been in contact with Carina, she turned to the trial judge and asked whether she had to answer this question. When directed to do so, Yolanda responded that she had spoken to Carina several times via telephone.

## DISPOSITION

The judgment is reversed, and the matter is remanded for a new trial.

NOT TO BE PUBLISHED


                                    CRANDALL, J.*


We concur:



ROTHSCHILD, P. J.



CHANEY, J.

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.